FILED
CLERK, U S. DISTRICT COURT

16 MAR 01 PM 2: 13

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

ANDERSON & KARRENBERG
SCOTT A. CALL (0544)
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: 801/534-1700

Liaison Counsel

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
WILLIAM S. LERACH
EDWARD P. DIETRICH
DOUGLAS R. BRITTON
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LYNDA STEINBECK, On Behalf of Herself and All Others Similarly Situated, | ) Case No. 2:00CV848-B<br>) **(Consolidated)** |
| Plaintiffs, | )<br>) PROPOSED CLASS ACTION |
| vs. | )<br>) AMENDED CLASS ACTION<br>) COMPLAINT FOR VIOLATION OF |
| SONIC INNOVATIONS, INC., ANDREW RAGUSKUS, STEPHEN WILSON, ANTHONY B. EVNIN, LUKE B. EVNIN, G. GARY SHAFFER, ALAN M. WOLFE and SIGRID VAN BLADEL, | ) THE SECURITIES ACT OF 1933 AND<br>) THE SECURITIES EXCHANGE ACT<br>) OF 1934<br>)<br>) |
| Defendants. | )<br>) JURY DEMAND |



## SUMMARY

1.      This is a class action on behalf of all persons who acquired the stock of Sonic Innovations, Inc. ("Sonic" or the "Company") between May 2, 2000 and October 24, 2000 (the "Class Period").   Sonic sells programmable digital hearing aids and hearing aid components.   Sonic went public on May 2, 2000, in an initial public offering (the "IPO"), pursuant to a Registration Statement and Prospectus (the "Prospectus") filed with the Securities and Exchange Commission (the "SEC").  Defendants told investors that Sonic had a contract with *its largest customer,* Starkey Laboratories ("Starkey"), to purchase *$16 million of Sonic's hearing aid components in 2000 and $18 million in 2001*, that its relationship with Starkey was "*strong*" and "*highly profitable*" and that sales to Starkey had generated strong revenue growth for Sonic and would *continue to generate strong growth for Sonic through 2001*.   As a result of these positive representations, defendants successfully completed Sonic's IPO on May 2, 2000, selling 4.1 million shares of Sonic common stock at $14.00 per share for net proceeds of $53.9 million.

2.      Following the IPO, defendants continued to misrepresent the strength and profitability of Sonic's relationship with Starkey, reported consecutive quarters of "record" financial results (which defendants attributed in large part to Sonic's sales to Starkey) and forecasted strong earnings growth for the third quarter and fourth quarters of 2000 and for FY 2001.  Sonic's stock quickly soared from its $14.00 offering price to a Class Period high of $22.25 per share. But then, on October 24, 2000, just weeks after representing that Sonic's relationship with Starkey was strong and that Starkey had fulfilled its contractual obligation through FY 2000 by placing $8 million in orders, defendants stunned the market by revealing that *Sonic's relationship with Starkey had essentially dissolved* and that *it had been deteriorating for more than five months*. In stark contrast to their Class Period statements, defendants stated that Sonic's relationship with Starkey had become a "challenge," that the Company had reduced its expectation for a long-term relationship with Starkey and that

***Sonic was removing "guaranteed" sales to Starkey in 2001 of $18 million from its internal budget*** despite Starkey's purported contractual obligation to make the purchases. Sonic's stock collapsed ***from $10.875*** on October 20, 2000 to ***just $5.50 per share*** on October 25, 2000 with volume of 1.5 million shares (by far the largest one-day stock volume for Sonic since it went public) as analysts ***slashed their FY 2001 earnings estimates from $0.48 cents per share to just $0.05 per share***. Sonic then announced a large fourth quarter net loss of more than $1.3 million, ***with virtually no sales to Starkey***.

3.      In the end, many of the shipments that Sonic delivered to Starkey in the second and third quarters were returned in the fourth quarter despite the fact that Sonic had recognized revenue on those "sales" much earlier. Defendants also agreed to amend Sonic's agreement with Starkey ***to eliminate the $18 million purchase order required from Starkey in FY 2001***.

4.      The graph below shows the price action of Sonic stock during the Class Period, as defendants' false and misleading statements drove Sonic's stock price to an artificially inflated Class Period high of $22.25. The graph also illustrates the collapse of Sonic common stock as the previously concealed facts about Sonic's relationship with Starkey emerged:



Sonic Innovations, Inc.
May 3, 2000 - October 25, 2000
Daily Share Prices

## OVERVIEW

5.    Since 1991, Sonic has designed, manufactured and marketed advanced digital hearing aids and hearing aid components.  Sonic's hearing aids, and the components sold to hearing aid manufacturers such as Starkey, are based upon Sonic's patented digital signal processing ("DSP") technologies.  These technologies allow hearing aids that incorporate Sonic's components to be programmed to address the unique hearing loss requirements of individual users.

6.    The hearing aid market is fiercely competitive and is segmented between analog and digital products.  At the time of the IPO, digital hearing aids were the fastest growing segment of the hearing aid market with increasing competition and rapid new product introductions. Sonic's ability to survive in this competitive market depended

- 3 -

exclusively on its ability to produce new and innovative products more rapidly than was typical in the hearing aid industry. It also depended significantly on Sonic's ability to fund ongoing operating expenses, which had skyrocketed for Sonic since its inception.

7.      In 1998, Sonic released its first branded hearing aid, which Sonic designed to be smaller and provide more natural sound than competing hearing aids. Sonic's branded hearing aid was based on its first generation hearing aid component (the "IC-1" chip), a microchip that allowed doctors to control various bands of sound waves into the ear. During 1998, Sonic also began developing its second generation hearing aid component (the "IC-2" chip), which was designed to eliminate circuit noises found in Sonic's IC-1 chip. The IC-2 chip incorporated advanced noise reduction technology to accomplish this objective.

8.      Despite the competitive disadvantage, in 1998 Sonic sought to sell its hearing aid components to Starkey, one of its largest competitors. Although defendants were very concerned that Starkey's access to the IC-1 chip would drive Sonic out of business, defendants were forced to sell Sonic's hearing aid components to Starkey because Sonic had encountered difficulties introducing its branded hearing aids to the market and was desperately in need of capital. Indeed, by December 1998, Sonic had generated a mere $2 million in revenues and had incurred more than $22 million in net losses and almost $11 million in research and development expenses developing its products. Sonic was betting its future on the IC-2 chip, which was then in current development. The IC-2 chip was far superior to the IC-1 chip, and cured inherent circuit noise found in the IC-1 chip that Sonic was attempting to sell to Starkey.

9.      In April 1999, Sonic entered into an agreement with Starkey (the "OEM Agreement") to sell Starkey its IC-1 chips. Under the terms of the agreement, Starkey agreed to purchase a minimum quantity of Sonic's components on an annual basis for a period of three years. However, because of defendants' concern that releasing Sonic's technology to Starkey would likely devastate Sonic's business, defendants demanded that Starkey refrain

from selling hearing aids containing the IC-1 chip in the United States until October 1, 1999. Defendants believed that this restriction on time and territory would give Sonic an opportunity to develop the IC-2 chip and implement the chip into its own hearing aids. *Defendants did not disclose to Starkey the true reason for the restrictive term or that the IC-1 chip that Sonic was selling to Starkey would quickly become obsolete, and would render Starkey's hearing aids technologically inferior to Sonic's hearing aids.*

10.     On December 14, 1999, Sonic and Starkey amended the agreement to guarantee Sonic $16 million in orders in 2000 and $18 million in orders in 2001. Because of the competitive nature of the hearing aid industry, *defendants continued to conceal from Starkey that Sonic was developing the new advanced IC-2 component*, which Sonic intended to release in March 2000 (*just 3 months after Starkey signed its two year contract with Sonic for IC-1 chips*).

11.     However, Sonic's agreement with Starkey did not solve Sonic's financial problems. While Starkey agreed to purchase a significant quantity of components from Sonic, the Company's financial situation continued to deteriorate. In 1999 alone, Sonic had generated a $15 million net loss and more than $7 million in research and development expenses. As Sonic's need for capital grew desperate, Sonic sought out cash from numerous sources. In 1999, Sonic obtained a $4 million bank line of credit, and sold a total of $10 million in promissory notes to one of the Company's largest distributors, Hoya Healthcare Corporation. These sales were specifically conditioned on convertibility to common stock at, or slightly below, Sonic's offering price of $14 per share. Without this influx of capital, Sonic would have been unable to fund ongoing projects (which were critical to Sonic's survival in the hearing aid market), and would have likely ceased to exist as a viable independent entity.

12.     In or around March 2000, Sonic released a new branded hearing aid that incorporated its advanced IC-2 technology and *eliminated the circuit noises found in the*

- 5 -

*IC-1 chips that Sonic was selling to Starkey.* Shortly after this release, Starkey CEO William Austin ("Austin") discovered that the IC-1 chips that Starkey was purchasing from Sonic were technologically inferior to the components that Sonic was now incorporating into its own hearing aids. In a meeting between Austin and Raguskus in or around April 2000, Austin stated that Starkey did not agree to purchase $35 million of product that had already been superseded by more advanced technology and that Starkey's two-year agreement was based on obtaining Sonic's best technology. Austin stated that if Sonic had disclosed to Starkey in their initial negotiations that Sonic's IC-2 chip eliminated circuit noises found in the IC-1 chips that Sonic was shipping to Starkey, *Starkey would never have agreed to annual commitment to purchase IC-1 chips. Austin also stated that Starkey would stop paying for the IC-1 chips* already shipped to Starkey, *would not place $16 million in orders in 2000 or $18 million in orders in 2001*, and would *cancel the entire agreement if Sonic did not agree to sell Starkey its advanced IC-2 technology.* Defendants refused!

13.     Since defendants rejected Austin's demands, Starkey followed through on Austin's stated intention to breach the OEM Agreement. By the time that Sonic went public on May 2, 2000, Starkey had defaulted on at least $1.6 million in payment obligations to Sonic. As a result of Austin's refusal to pay for the IC-1 chips, Sonic's days sales outstanding ("DSO") for sales to Starkey jumped from just 37 days in the fourth quarter of 1997 to 49 days in the first quarter of 2000.

14.     Despite these dramatic problems with Starkey, defendants Raguskus and Wilson made roadshow presentations during April 2000 in Los Angeles, San Francisco, New York City and Chicago in order to condition the market and investors for the Sonic IPO, which Sonic had to complete in order to obtain desperately needed capital. During each of these scripted roadshow presentations, which were largely drafted by Raguskus and Wilson, defendants falsely represented that *Sonic's relationship with Starkey (by far its most important customer) guaranteed Sonic revenues through FY 2001.* Defendants did not

disclose, however, that Sonic's largest customer had just breached the most important agreement in Sonic's history.  Instead, defendants stated that:

- The market for hearing aids was very large, with approximately 300 million hearing impaired people worldwide;

- Existing hearing aids had failed to satisfy users because they had poor sound quality, were uncomfortable, and unreliable;

- Only 20% of the people who needed hearing aids were using hearing aids;

- The market for hearing aids was growing and would continue to grow rapidly as the "baby boomer" population aged;

- Worldwide retail sales of hearing aids were $4.6 billion and wholesale sales were $1.8 billion;

- Sonic was capitalizing on rapid growth in the digital segment of the industry by selling advanced branded hearing aids and hearing aid components that set a new standard in consumer satisfaction because they are smaller, more comfortable, more reliable, and deliver more natural sound than competing hearing aids;

- Sonic's business was performing very well and ahead of its plan, with sales to its OEM's (of which Starkey represented nearly 90%) generating strong revenue growth;

- Starkey had agreed to place orders totaling $16 million of Sonic's hearing aid components in 2000 and $18 million in 2001;

- Sonic's relationship with Starkey was "strong" and "highly profitable" and would generate at least $33 million in revenue growth for Sonic in fiscal years 2000 and 2001;

- As a result of these positive factors, Sonic would achieve strong revenue and earnings growth in the third and fourth quarters of FY 2000, with revenue of approximately $15.0 and $17.0 million, respectively, and earnings of $0.03 and $0.06 per share, respectively; and

- Also as a result of these positive factors, Sonic would achieve earnings of approximately $0.04 per share in FY 2000 and $0.44 per share in FY 2001.

15.     In addition to Raguskus and Wilson's false statements on the roadshow, Sonic's Prospectus also misrepresented the Company's relationship and contractual arrangement with Starkey and emphasized the importance of the Starkey relationship to Sonic's future growth. Sonic's Prospectus represented that *Starkey had accounted for more than 41% of Sonic's net sales in the fourth quarter of 1999 and 26% of Sonic's net sales for the entire fiscal*

*year*, and that Starkey was "*obligated to make minimum purchases for 2000 and 2001 that are greater than the purchases it made in 1999.*"

16.     Defendants also falsely portrayed Sonic's relationship with Starkey following the IPO and recognized revenue from sales to Starkey in violation of the Generally Accepted Accounting Principles ("GAAP"). Defendants caused Sonic to falsely report "record" sales and earnings for the second quarter of fiscal 2000, falsely stated to analysts that *Sonic's relationship with Starkey was "solid" and "profitable,"* and *forecasted strong revenue growth for Sonic in the third and fourth quarters of 2000 and for FY 2001*. At no time did defendants disclose Starkey's anticipatory breach of the OEM Agreement or that Starkey had refused to pay for $1.6 million in IC-1 shipments *prior to the IPO*. In fact, Sonic's DSO for sales to Starkey skyrocketed again in the second and third quarters (from 49 days in Q100 to 127 days in Q200 to 217 days in Q300).

17.     As a result of defendants' positive representations, Sonic's May 2, 2000 IPO was a great success and its stock price soared from $14 per share to a Class Period high of $22.25. Sonic was able to raise $53.9 million in the offering, boosting the book value of its shares by $2.29 (from $0.77 to $3.06 per share), a $27.4 million windfall for Sonic's controlling shareholders who owned some 12 million shares.

18.     Defendants' representations in the roadshow, Sonic's Prospectus, their statements following the IPO, and Sonic's report of "record" sales and earnings for the second quarter were false and misleading when made. Contrary to defendants' representations, Sonic's relationship with Starkey was *not* "solid" or "profitable," and would *not* guarantee orders for Sonic of $16 million in 2000 and $18 million in 2001. In fact, *Sonic's relationship with Starkey began to deteriorate even before the IPO* because defendants had concealed the development of Sonic's IC-2 chip from Starkey during the companies' late 1998 and early 1999 contract negotiations. After defendants' meeting with Austin in April 2000, Austin followed through on his refusal to pay for the IC-1 components that Sonic had

- 8 -

already shipped to Starkey and *defaulted on at least $1.6 million prior to the IPO*. In fact, Starkey defaulted on at least $6.6 million in payment obligations to Sonic throughout the Class Period, and returned approximately $1 million of Sonic's IC-1 chips because of circuit noise problems. Sonic's purported "record" results for the second quarter were also materially overstated and violated GAAP because Sonic had shipped excessive quantities of its IC-1 chips to Starkey *knowing that Starkey demanded access to its IC-2 chip*, and that *millions of dollars worth of its IC-1 shipments would be returned*. Thus, defendants knew that their statements regarding the strength of Sonic's relationship with Starkey and guaranteed sales in 2000 and 2001 were materially false and misleading and that Sonic had no chance of meeting its forecasted results for fiscal years 2000 or 2001.

19.     Following the IPO, defendants also falsely characterized Class Period contract re-negotiations between Sonic and Starkey as nothing more than an attempt by Sonic to obtain quarterly sales minimums in order to bring stability to its earnings forecasts. According to defendants' Class Period representations, because Sonic was a publicly traded company, Starkey's annual commitments were not sufficient to give the securities market the quarterly revenue predictability expected of reported companies. Defendants represented that while Starkey was contractually committed to annual sales totaling $33 million through 2001, Sonic desired quarterly guarantees from Starkey, and that Sonic was considering providing Starkey with earlier access to its new technologies (but not its newest) in return. Defendants also falsely stated that Sonic's accounts receivable had doubled in Sonic's second quarter (from $5.6 million to $10.6 million) *merely because Sonic had agreed to extend Starkey's 30-day payment terms to the industry norm of 90 to 120 days* as the capital raised in Sonic's IPO eliminated Sonic's dependence on immediate payments from Starkey. Sonic announced that these negotiations caused Starkey to place $8 million in orders for 2001, and that the orders fulfilled Starkey's minimum purchase requirements for fiscal year 2000 *under*

*the companies' existing agreement* and resolved Sonic's quarter to quarter revenue uncertainty for the same period.

20.     Defendants' statements about Sonic's contract negotiations with Starkey were materially false and misleading when made. Contrary to defendants' representations, Sonic's contract re-negotiations with Starkey were *not* prompted by Sonic's desire for stable quarterly orders but were initiated *solely because Starkey cancelled the OEM Agreement* because Sonic refused to give Starkey access to the Company's newest technology. Defendants also failed to disclose that Sonic offered to extend payment terms to Starkey that *exceeded the industry norm* in order to induce Starkey to take shipments that it was already contractually committed to take during the third and fourth quarters of fiscal 2000. In addition to offering these undisclosed terms, Sonic was only able to secure the $8 million order *by agreeing to give Starkey its advanced IC-2 chip* (which defendants told the public that Sonic would not do) and by agreeing to accept returns from Starkey totaling between $2 million and $5 million in the fourth quarter. At no time did defendants disclose Starkey's anticipatory breach of the OEM Agreement or that *Sonic was forced to offer (and agree to) significant and material changes to the OEM Agreement to get Starkey to fulfill the minimum purchase requirements for fiscal year 2000*. Defendants also failed to disclose that Sonic's refusal to sell IC-2 chips to Starkey after the fourth quarter eliminated any possibility that Starkey would place $18 million in orders for Sonic components through 2001.

21.     On October 24, 2000, defendants shocked the investment community by disclosing what defendants had known before the IPO – that Sonic's relationship with Starkey had dissolved and *had been deteriorating since before the IPO*. Defendants stated that Sonic's relationship with Starkey had become a "challenge," that the Company had "'reduced [its] expectations for a long-term relationship with Starkey,'" and that Sonic had removed Starkey's guaranteed purchases in 2001 of $18 million from its internal budget because of Sonic's problems with Starkey. In an interview that same day, Raguskus stated

- 10 -

that Sonic and Starkey *"ha[d] been negotiating the future of their relationship for the past five months*." In response, Austin stated: "'We're not taking any more product.... We can't sell it.'"

22.    These adverse facts, which were known by defendants throughout the Class Period, directly contradicted defendants' representations that emphasized the Starkey relationship as "solid" and "profitable." In response to this shocking news, Sonic's stock price fell to $5.50 per share on heavy trading volume and caused the class millions in damages as analysts slashed their earnings estimates for Sonic in FY 2001 from $0.48 per share to just $0.05 per share (*or by 90%*). Later, Sonic reported horrible fourth quarter results (which were due to millions of dollars worth of product returns from Starkey), and announced that Sonic had agreed to give Starkey what they really wanted .... *"no guarantees of future purchases"* in an amended agreement that *dissolved the existing relationship for 2001*, including the required $18 million in orders.

## JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

24.    Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District. At all times during the Class Period, Sonic had its principal executive offices located at 2795 East Cottonwood Parkway, Suite 660, Salt Lake City, UT, 84121-7036.

25.     In connection with the acts, conduct and other wrongs complained of, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of the national securities markets.

## THE PARTIES

26.     Plaintiffs Anthony Di Benedetto and Raymond Durbala (the "Lead Plaintiffs") each purchased Sonic common stock during the Class Period at artificially inflated prices and were damaged thereby.  Each has been appointed lead plaintiff by Order of this Court dated January 31, 2001.

27.     Defendant Sonic maintains its headquarters at 2795 East Cottonwood Parkway, Suite 660, Salt Lake City, UT 84121. During the Class Period, Sonic's common stock traded in an efficient market on the NASDAQ National Market System under the ticker symbol SNCI.

28.     Defendant Andrew Raguskus ("Raguskus") is CEO and President of Sonic Innovations.  Raguskus personally negotiated the OEM Agreement with Starkey.

29.     Defendant Stephen Wilson ("Wilson") is Vice President and Chief Financial Officer of Sonic Innovations.  Wilson signed the false and misleading Prospectus and Registration Statement on May 8, 2000.

30.     Anthony B. Evnin ("A. Evnin") has been a director of Sonic Innovations since October 1995. At all relevant times during the Class Period, A. Evnin was a General Partner of Venrock Associates ("Venrock"), one of Sonic's largest venture capitalists.  A. Evnin and Venrock beneficially owned 2.4 million shares of Sonic common stock (or 15.5% of Sonic before the IPO and 12.5% after the IPO).  A. Evnin represented Venrock Associates on Sonic's Board of Directors.

31.     Luke B. Evnin ("L. Evnin"), has been a director of Sonic Innovations since October 1995. At all relevant times during the Class Period, L. Evnin was a General Partner of MPM Asset Management LLC ("MPM"), one of Sonic's largest venture capitalists.

L. Evnin and MPM beneficially owned 2.2 million shares of Sonic common stock (or 13.1% of Sonic before the IPO and 10.6% after the IPO). L. Evnin represented MPM and Accel Partners on Sonic's Board.

32. G. Gary Shaffer (Shaffer") has been a director of Sonic Innovations since October 1997. At all relevant times during the Class Period, Shaffer was a General Partner of Morgenthaler Ventures, one of Sonic's largest venture capitalists. Shaffer and Morgenthaler Ventures beneficially owned 1.7 million shares of Sonic common stock (or 11.0% of Sonic before the IPO and 8.9% after the IPO). Shaffer represented Morgenthaler Ventures on Sonic's Board of Directors.

33. Allan M. Wolfe ("Wolfe") has been a director of Sonic Innovations since October 1995. At all relevant times during the Class Period, Wolfe was a General Partner of Utah Ventures, one of Sonic's largest venture capitalists who owned 675,370 shares of Sonic common stock. Wolfe represented Utah Ventures on Sonic's Board of Directors.

34. Sigrid Van Bladel ("Van Bladel") has been a director of Sonic Innovations since October 1997. At all relevant times during the Class Period, Van Bladel was a General Partner of New Enterprise Associates, one of Sonic's largest venture capitalists. Van Bladel and New Enterprise Associates owned 1.7 million shares of Sonic common stock (or 11.1% of Sonic before the IPO and 9.0% after the IPO). Van Bladel represented New Enterprise Associates on Sonic's Board of Directors.

35. The individuals named as defendants in ¶¶28-29 are referred to herein as the "Officer Defendants." The Officer Defendants are liable for the false statements pleaded herein at ¶¶57, 58, 60, 62-65, 68-70, 74 and 75, as those statements were each "group-published" information, the result of the collective action of the defendants.

36. The Officer Defendants, by reason of their positions with Sonic, were controlling persons of Sonic. Sonic controlled each of the Officer Defendants. These

controlling persons are liable under §15 of the Securities Act and §20(a) of the Exchange Act.

37.     The individuals named as defendants in ¶¶30-34 are referred to herein as the "Director Defendants."  By reason of their positions on Sonic's board of directors and committees thereof, and their ownership of approximately 50.7% of Sonic common stock, and by constituting a majority of the board of directors with five of seven members, the Director Defendants controlled each of the Officer Defendants and are liable as control persons under §15 of the Securities Act and §20(a) of the Exchange Act.  The Director Defendants are also liable for the false statements pleaded herein at ¶¶57, 58, 60, 62-65, 68-70, 74 and 75, as those statements were each "group-published" information, the result of the collective action of the defendants.

38.     Sonic, the Officer Defendants and the Director Defendants are collectively referred to as "defendants."

39.     Because of the Officer Defendants' positions with the Company, they each had access to the adverse non-public information about Sonic's business, finances, products, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

40.     The defendants, because of their positions with the Company, controlled and/or possessed the power and authority to control the contents of its filings with the SEC, press releases and presentations to securities analysts, which information was conveyed through the analysts to the investing public.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to

- 14 -

be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## SONIC'S AND ITS INSIDERS' KNOWLEDGE OR RECKLESS DISREGARD OF THE COMPANY'S FALSE STATEMENTS AND MOTIVE TO COMMIT SECURITIES FRAUD

41.    The Officer Defendants were Sonic's top officers and, because of their respective positions in the Company, were each involved in the day-to-day management of Sonic's business.  Each also had inside knowledge of the Company's adverse financial performance, and the means and ability to circumvent Sonic's financial controls and GAAP requirements, which were in fact circumvented.  The Officer Defendants were Sonic's top operating officers and managers and had constant contact with each other and regularly discussed the critical issues facing Sonic during the Class Period, including: (a) sales to and new orders from Starkey, its largest customer; (b) the loss of Starkey as an OEM partner; (c) Austin's stated intention to cancel the OEM Agreement if Sonic did not provide Starkey with access to the IC-2 chip; (d) Starkey's refusal to pay for IC-1 chips shipped by Sonic pursuant to the OEM Agreement; (e) Starkey's default on at least $6.6 million in payment obligations to Sonic; (f) Starkey's product returns of up to 5,100 IC-1 chips because of noise problems; (g) Sonic's renegotiation with Starkey because of Austin's threat to cancel the agreement if Starkey was not given access to the IC-2 chip; (h) Sonic's attempt to obtain $8 million in product orders in the third and fourth quarters of 2000 from Starkey by agreeing to extend Starkey's payment terms to 180 days (up from net 30), and to give Starkey access to the IC-2 chip in the fourth quarter of 2000; and (i) Sonic's agreement to accept between $2 million and $5 million in returns of IC-1 chips from Starkey in order to induce Starkey to agree to $8 million in orders in the third and fourth quarters of 2000.  Thus, each Officer Defendant

actually knew or recklessly disregarded that the public statements about Sonic pleaded at ¶¶57, 58, 60, 62-65, 68-70, 74, and 75 were false or misleading when made.

42.    Through attending regular management meetings, discussions between defendants Raguskus, Wilson, and Jorgen Heide ("Heide"), Sonic's Vice President of International OEM sales, and by receiving regular delinquency and return reports, the Officer Defendants knew: (a) that Starkey refused to honor the minimum commitments described in the OEM Agreement; (b) that Starkey had stated its intention to breach the OEM agreement if not given access to Sonic's IC-2 chip; (c) that Starkey had stopped paying for Sonic's IC-1 chips and was in default on millions of dollars in payment obligations to Sonic; (d) that Starkey had complained that Sonic's IC-1 chips were causing Starkey's hearing aids to generate a loud circuit noise that was unacceptable to Starkey's customers; (e) that Sonic's DSOs had skyrocketed from 49 days in Q100 to 127 days in Q200 to 217 days in Q300; (f) that Sonic had agreed to extend Starkey's payment terms from net 30 days to 180 days in order to get Starkey to accept $8 million in shipments by the end of fiscal 2000 (which they were already legally obligated to do); (g) that Sonic had agreed to accept product returns totaling between $2 million and $5 million to get Starkey to place $8 million in product orders; and (h) that Sonic had agreed to provide Starkey with the IC-2 chip in the fourth quarter of 2000 in order to get Starkey to place $8 million in orders by the end of fiscal 2000. Defendants also knew of Sonic's serious problems with Starkey because Sonic was completely dependant on Starkey – its single largest customer – for consistent revenue and earnings growth through FY 2001.

43.    In addition, because Sonic's business was so dependant upon sales to Starkey, the Officer Defendants were intimately familiar with orders placed by Starkey, shipments made to Starkey, and payments received from Starkey. Because of Sonic's dependance on sales to Starkey, the Starkey account was tremendously important to Sonic's top insiders and was a matter of daily attention for them. Because of the importance of the Starkey

relationship on Sonic's viability, financial health, overall growth, and ultimately on Sonic's stock price, as part of managing Sonic's business, Sonic's top executives closely monitored the Starkey account and Starkey's orders, delinquencies and returns. For instance, Raguskus and Wilson had regular contacts and meetings with Heide, who was primarily responsible for the Starkey account at Sonic. Heide kept defendants Raguskus and Wilson regularly informed about the status of the Starkey account and of Starkey's delinquencies and returns. Moreover, defendant Raguskus was primarily responsible for negotiating the original and amended agreements with Starkey (and concealing the IC-2 chip's existence from Starkey) and had direct contact with Austin, who had told Raguskus that Starkey would cancel the OEM Agreement if Starkey was not given access to the IC-2 chip. He also told Raguskus that Starkey would not pay for IC-1 shipments until Sonic agreed to his terms. Thus, the Officer Defendants had actual knowledge that Starkey was in default on (and had breached) the OEM Agreement, and did not intend to honor the minimum commitments outlined in the agreement. Since Starkey accounted for 33% of Sonic's sales, defendants knew it would be virtually impossible for Sonic to achieve its forecasted revenue and earnings growth for FY 2000 and FY 2001.

44.    The Officer Defendants were the top executives of Sonic. They ran Sonic as "hands on" managers, dealing with important issues facing Sonic's business. The Officer Defendants controlled and participated in the drafting and preparation of the Company's SEC filings as well as corporate reports relating to them. Each Officer Defendant had the ability and opportunity to prevent the issuance of, or cause to be corrected, the SEC reports and corporate press releases and statements disseminated during the Class Period. However, each Officer Defendant failed to do so, despite their knowledge of the disastrous nature of Sonic's relationship with Starkey and of Sonic's improper accounting practices, which were contrary to GAAP.

45.     Defendant A. Evnin was much more involved in Sonic's day-to-day operations than is normally the case with an outside director.  This was because Evnin represented Venrock on Sonic's Board and Venrock was concerned over its investment in Sonic.  A. Evnin was in frequent contact with Raguskus and Wilson to get information about Sonic's business, and received copies of Sonic's operating and budget reports circulated to executives.  A. Evnin was also a member of a two director compensation committee.  As a member of the compensation committee, A. Evnin determined the compensation of Sonic's top executive officers.

46.     Defendant L. Evnin was also much more involved in Sonic's day-to-day operations than is normally the case with an outside director.  This was because Evnin represented MPM on Sonic's Board and MPM was concerned over its investment in Sonic. L. Evnin was in frequent contact with Raguskus and Wilson to get information about Sonic's business, and received copies of Sonic's operating and budget reports circulated to executives.  L. Evnin was also a member of a three director audit committee.  As a member of the audit committee, L. Evnin reviewed Sonic's false and misleading financial statements and accounting practices during the Class Period.

47.     Defendant Shaffer was also much more involved in Sonic's day-to-day operations than is normally the case with an outside director.  This was because Shaffer represented Morgenthaler Ventures on Sonic's Board and Morgenthaler Ventures was concerned over its investment in Sonic.  Shaffer was in frequent contact with Raguskus and Wilson to get information about Sonic's business, and received copies of Sonic's operating and budget reports circulated to executives.

48.     Defendant Wolfe was also much more involved in Sonic's day-to-day operations than is normally the case with an outside director.  This was because Wolfe represented Utah Ventures on Sonic's Board and Utah Ventures was concerned over its investment in Sonic.  Wolfe was in frequent contact with Raguskus and Wilson to get

information about Sonic's business, and received copies of Sonic's operating and budget reports circulated to executives. Wolfe was also a member of a two director compensation committee. As a member of the compensation committee, Wolfe determined the compensation of Sonic's top executives.

49.     Defendant Van Bladel was also much more involved in Sonic's day-to-day operations than is normally the case with an outside director. This was because Van Bladel represented New Enterprise Associates on Sonic's Board and New Enterprise Associates was concerned over its investment in Sonic. Van Bladel was in frequent contact with Raguskus and Wilson to get information about Sonic's business, and received copies of Sonic's operating and budget reports circulated to executives. Van Bladel was also a member of a three director audit committee. As a member of the audit committee, Van Bladel reviewed Sonic's false and misleading financial statements and accounting practices during the Class Period.

50.     By reason of their positions on Sonic's board of directors and committees thereof, their control of the board of directors, their ownership of a substantial amount of Sonic stock, their frequent contacts with defendants Raguskus and Wilson, and their receipt of Sonic's operating and budget reports, the Director Defendants knew that Sonic's relationship with Starkey had deteriorated, that Starkey had repudiated the OEM Agreement prior to the IPO, and that the Starkey relationship would not generate $33 million in sales for Sonic through FY 2001. In fact, because of their membership on Sonic's audit committee, defendants L. Evnin and Van Bladen knew that Sonic's financial statements were materially false and misleading and violated GAAP. Thus, each Director Defendant had the ability and opportunity to prevent the issuance of, or cause to be corrected, the SEC reports and financial statements disseminated during the Class Period. However, each Director Defendant failed to do so, despite their knowledge of the disastrous nature of the Starkey relationship and of Sonic's improper accounting practices.

- 19 -

51.    During the Class Period, the defendants engaged in the scheme described herein to complete Sonic's May 2, 2000 IPO, which generated $53.9 million in proceeds for Sonic at a time when the Company was desperate for operating capital. Prior to the IPO, Sonic had a history of increasing net losses and negative cash flows from operating activities and suffered from dramatically increasing research and development expenses and decreasing investment capital. Sonic's operating losses jumped from $1 million in 1995 to $13 million in 1999, with a cumulative total operating loss of $37 million for the entire period. Net cash used in operating activities increased dramatically from $4.6 million in 1997 to $14.0 million in 1999, with Sonic's cash and cash equivalents account declining sharply from $11.9 million in 1998 to a paltry $5.9 million in 1999. Sonic's research and development expenses also jumped from $136,000 in 1995 to $7 million in 1999 and total operating expenses skyrocketed from $1 million in 1995 to $25.3 million in 1999:

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 |
| | (In thousands, except share and per share data) | | | | |
| Consolidated Statements of Operations: | | | | | |
| Net sales | $   -- | $   -- | $   -- | $ 2,143 | $28,694 |
| Cost of sales | $   -- | $   -- | $   -- | 2,056 | 17,062 |
| Gross profit............ | -- | -- | -- | 87 | 11,632 |
| Operating expenses: Selling, general & administrative | 944 | 455 | 1,471 | 8,444 | 17,343 |
| Research and development | 136 | 1,090 | 3,855 | 5,832 | 7,015 |
| Stock-based compensation.... | -- | -- | -- | -- | 1,025 |
| Total operating expenses... | 1,080 | 1,545 | 5,326 | 14,276 | 25,383 |

| | | | | | |
|---|---|---|---|---|---|
| Operating Loss..... | (1,080) | (1,545) | (5,326) | (14,189) | (13,751) |
| Other Income(Expense).. | 7 | (39) | 91 | 311 | (1,155) |
| Net Loss............ | (1,073) | (1,584) | (5,235) | (13,878) | (14,906) |

\*   \*   \*

|  | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 |
| | | | (In thousands) | | |
| Consolidated Balance Sheet Data: | | | | | |
| Cash and cash equivalents.... | $ 1,146 | $ 1,264 | $ 1,718 | $11,930 | $ 5,939 |
| Working capital (deficit)..... | 1,085 | 1,996 | 10,521 | 8,706 | (5,119) |
| Total assets...... | 1,250 | 2,619 | 13,091 | 16,872 | 18,462 |
| Long-term obligations.. | 485 | 438 | 625 | 1,690 | 2,085 |
| Convertible promissory notes | -- | -- | -- | -- | 8,064 |
| Mandatorily redeemable convertible preferred stock | 1,783 | 4,636 | 19,555 | 33,662 | 36,130 |
| Total stockholders' deficit...... | (1,100) | (2,801) | (8,549) | (23,853) | (38,801) |

52.    As the foregoing trends reveal, Sonic's financial condition eroded to the point where a public offering was the only means available for defendants to continue Sonic's operations. Because Starkey represented 26% of Sonic's sales in 1999 and 41% of its sales in the fourth quarter of 1999, defendants were motivated to conceal the serious problems with the Starkey relationship, including Starkey's breach of millions in payment obligations and Austin's stated intention to breach the minimum purchase requirements in the OEM Agreement.

53.   Defendants also had the motive and the opportunity to make the false statements and perpetrate the scheme described herein.   Sonic's financing as a private company came from venture capitalists, including Venrock, Accel Partners, MPM, New Enterprise Associates, Morgenthaler Ventures, Utah Ventures and the Travelers Insurance Company, who, by 1999, had invested at least $28.3 million in Sonic, for about 8.8 million shares of Sonic stock.   Sonic's venture capital investors hoped that Sonic's hearing aids and hearing aid components would enable it to capitalize on the strong growth of the hearing aid market.   However, by mid-1999, Sonic's insiders realized that things were not developing as they had hoped.   While Sonic had developed its first generation line of hearing aids and had sold its advanced technology to Starkey, Sonic had significant difficulties introducing its product to the market and continued to incur increasingly enormous losses.

54.   These negative conditions in Sonic's business posed a significant danger to the Officer Defendants, Director Defendants and controlling shareholders.   Sonic's controlling shareholders were locked into an illiquid and threatened investment which they realized would not result in them achieving the type of profitable return they had hoped for.   Since Sonic was a private company, there was no trading market into which they could sell their Sonic shares to salvage their investment.   They knew that any attempt to sell Sonic would result in the buyer pursuing due diligence and likely discovering serious problems they knew were negatively impacting Sonic's business.

55.   In order to escape from this dangerous situation, at the insistence of the Director Defendants, the Officer Defendants agreed to do an IPO of Sonic.   This would enable Sonic to raise millions of dollars, providing capital to Sonic it could not otherwise raise and would increase the book value of the Sonic shares held by the defendants and Sonic's controlling shareholders.   The IPO would create a trading market in Sonic stock into which the defendants would be able to later sell off their Sonic shares at artificially inflated prices.   Sonic also used the IPO to raise capital in 1999.   Because of its desperate capital

needs in 1999, Sonic sold to its largest distributor, Hoya Healthcare, $10 million in promissory notes owned by Sonic, which Hoya only agreed to on the condition that the notes automatically convert to Sonic common stock at, or slightly below, the offering price of $14 per share.

56.    The Officer Defendants were under considerable pressure from the Director Defendants and Sonic's controlling shareholders to maintain and artificially inflate Sonic's stock price.  If defendants had revealed Sonic's true financial condition and the deteriorating nature of the Starkey relationship prior to the IPO, Sonic would not have been able to complete the offering at the $14 offering price, if at all.  Had Sonic disclosed the problems with the Starkey relationship following the IPO, Sonic's stock price would have collapsed because Sonic was largely dependant on Starkey's orders for its primary source of revenue and capital.  With this collapse, Sonic's largest shareholders had the potential of losing millions of dollars through their investment in Sonic, which they had just salvaged through Sonic's IPO.  As a result, defendants were motivated to, and did, commit the wrongful acts alleged herein.

## FALSE AND MISLEADING STATEMENTS

57.    To create demand for Sonic stock on the IPO, defendants knew that a campaign to distribute favorable information to potential investors about Sonic's relationship with Starkey and the guaranteed sales that the relationship would purportedly generate for Sonic throughout 2001 was necessary.  Thus, defendants organized a "roadshow" to take place prior to the IPO where defendants Raguskus and Wilson traveled to New York, Chicago, San Francisco and Los Angeles to meet with institutional investors and money and portfolio managers in April 2000, and made very favorable presentations about Sonic.  During these roadshow presentations, in connection with Sonic's IPO, Raguskus and Wilson stated:

- The market for hearing aids was very large, with approximately 300 million hearing-impaired people worldwide;

- Existing hearing aids had failed to satisfy users because they had poor sound quality, were uncomfortable, and unreliable;

- Only 20% of the people who needed hearing aids were using hearing aids;

- The market for hearing aids was growing and would continue to grow rapidly as the "baby boomer" population aged;

- Worldwide retail sales of hearing aids were $4.6 billion with wholesale sales totaling $1.8 billion;

- Sonic was capitalizing on rapid growth in the digital segment of the industry by selling branded hearing aids and hearing aid components;

- Sonic's business was performing very well and ahead of its plan, with sales to its OEM's (of which Starkey represented nearly 90%) generating strong revenue growth;

- Starkey had agreed to place orders totaling $16 million of Sonic's hearing aid components in 2000 and $18 million in 2001, with minimum annual commitments;

- Sonic's relationship with Starkey was "strong" and "highly profitable" and would generate revenue growth for Sonic in fiscal years 2000 and 2001;

- As a result of these positive factors, Sonic would achieve strong revenue and earnings growth in the third and fourth quarters of FY 2000, with revenue of approximately $15.0 and $17.0 million, respectively, and earnings of $0.03 and $0.06 per share, respectively; and

- Also as a result of these positive factors, Sonic would achieve earnings of approximately $0.04 per share in FY 2000 and $0.44 per share in FY 2001.

These representations increased the demand for Sonic stock and enabled Sonic to price the IPO at an artificially inflated price of $14 per share and helped to artificially inflate Sonic's stock price in the aftermarket as well. The information disseminated during the roadshow was part of the total mix of information affecting Sonic's IPO on May 2, 2000 and the price at which its shares were first sold and thereafter traded.

58.    On May 2, 2000, defendants issued Sonic's Prospectus for the sale of 4.1 million shares of Sonic common stock, which was contained in a Registration Statement signed by defendant Wilson. Like defendants' roadshow presentations, Sonic's Prospectus outlined the importance of its relationship with Starkey and represented that the Starkey relationship had guaranteed annual sales to Sonic through 2001, with Starkey being

contractually committed to make minimum annual purchases that were greater than the purchases that Starkey made in 1999:

> Sales of hearing aid components, consisting of our DSP platform, to established hearing aid manufacturers comprised the remaining 36% of net sales in 1999. Sales of our hearing aid components to Starkey Laboratories, Inc., which sells its own brand of digital hearing aids based on our DSP platform, comprised approximately 26% of our net sales. ***Starkey is obligated to make minimum purchases for 2000 and 2001 that are greater than the purchases it made in 1999.***

*   *   *

> ***[S]ales of components to Starkey Laboratories, Inc. accounted for approximately $7.3 million, or 26%, of net sales in 1999 and approximately $4.7 million, or 41%, of net sales in the fourth quarter of 1999.***

59.     The roadshow and Prospectus statements forecasting strong revenue and earnings growth through FY2001 and describing Sonic's relationship with Starkey as "strong," "profitable" and guaranteeing $33 million in annual sales for Sonic through FY2001 were materially false or misleading when made. Shortly before Sonic's IPO, Starkey CEO, Austin, learned that Sonic had developed the IC-2 chip, which eliminated a loud circuit noise found in the IC-1 chips that Sonic was selling to Starkey, and that defendant Raguskus had concealed the chip's development from Austin during the companies' late 1998 and early 1999 contract negotiations. Upon discovering the IC-2 chip's advanced technology, Austin told defendant Raguskus that Starkey would terminate the OEM Agreement if Sonic did not agree to sell the IC-2 chip to Starkey instead of the IC-1 chip, and refused to pay for the IC-1 shipments that Sonic had already delivered to Starkey. In fact, by May 1, 2000 (the day before the IPO), Starkey had made few, if any, payments for the IC-1 chips already shipped by Sonic and was in default on $1.6 million in payment obligations to Sonic because Sonic refused to sell the IC-2 chip to Starkey as Austin had demanded. Thus, at the time that Sonic's roadshow presentations and Prospectus forecasted strong growth and guaranteed sales to Starkey, Sonic knew that Starkey had breached the OEM Agreement, stopped ordering product from Sonic, and had no intention of honoring the minimum purchase requirements

- 25 -

outlined in the OEM Agreement.  At no time did defendants disclose these highly material

facts to the public.

60.     The Prospectus also contained a risk factor that was itself false and misleading

as it concealed an existing adverse event inside Sonic that was then adversely impacting

Sonic's business.  Sonic's risk disclosure described the "potential" risk of a loss of Starkey's

business as follows:

> In addition to selling finished hearing aids to a large number of hearing
> care professionals and distributors, we also sell hearing aid components to a
> limited number of hearing aid manufacturers.  These arrangements have
> accounted for a significant portion of our net sales to date. The loss of any of
> these large customers, or a significant reduction in sales to these customers,
> would significantly reduce our net sales and have a negative effect on our
> operating results. For example, sales of components to Starkey Laboratories,
> Inc. accounted for approximately $7.3 million, or 26%, of net sales in 1999
> and approximately $4.7 million, or 41%, of net sales in the fourth quarter of
> 1999. Although Starkey is contractually committed to purchase a minimum
> quantity of components through 2001, *if Starkey were to breach its agreement
> or were to not buy components after 2001, our net sales would decline
> substantially, and we may not be able to recover the lost revenue through
> other means*.

61.     This warning about the loss of revenue *if* Starkey were to breach its agreement

with Sonic did not disclose adverse events and conditions *that had already occurred.*  The

wording of this risk factor was such that the risk factor itself was false or misleading because

the language indicated that a breach by Starkey (and the negative ramifications that could

result from a breach by Starkey) was merely contingent.  To the contrary, when defendants

made this warning, *Starkey was then in default on $1.6 million in payments to Sonic*, had

breached the OEM Agreement requiring Starkey to pay within 30 days of shipment, and was

in anticipatory breach of the commitments that Sonic had discussed in the Prospectus by

stating its intention to breach the agreement further if Sonic did not give Starkey access to

the IC-2 chip.  Sonic concealed this information from investors in order to complete the IPO

and to generate proceeds of $53.9 million.

62.     On May 4, 2000, just two days after the IPO, defendant Raguskus agreed to an

interview with Francis Gaskins on Radio WallStreet.com.  In addition to answering questions

about Sonic's digital hearing aids and the purported benefits that Sonic's hearing aids brought

to the hearing impaired, defendant Raguskus brought up the issue of Sonic's component sales

to its OEM customers voluntarily. During his interview, Raguskus stated that Sonic's

technology was "so hot that all the big guys want to be able to share with it" and that Sonic's

strategy was to sell "one generation old technology to [Sonic's] OEM partners," which had

"worked very, very well for us":

> One final comment about the competition, when our products first hit the marketplace, they generated such excitement that many of the world's largest hearing aid companies came to us wanting to get their hands on our technology. So, we have partnered with Starkey Laboratories on an OEM basis. And we sell them some of our chips for inclusion in their products, and it's pretty interesting and the whole industry that's been relatively slow to innovate over the past 30 years; that we have come along as the innovators and that's what makes us different. Yes, we're small. Yes we have smaller sales and marketing presence in the world and these folks have been around for a long time, ***but our technology is so hot that all the big guys want to be able to share with it.*** So that gives us on the one hand, a fabulous opportunity to grow more quickly than we would just by building our own world-wide sales. But there's also a danger, that now we're selling boards to competitors whose larger sales and marketing cannons can fire them back at us and hurt us in the marketplace. ***So our strategy to walk this fine line is to innovate rapidly to keep the latest generation of technology in our own products, and to sell one generation old technology to these OEM partners. And so far it's worked very, very well for us.***

63.    On May 11, 2000, almost six weeks after the close of Sonic's first fiscal

quarter, Sonic announced "record results" and its "first-ever" operating profit for its first

quarter ended March 31, 2000, results which defendant Raguskus represented were based on

"continued strength of our hearing aid component business." According to the release, net

sales for the quarter totaled $12,396,000, an increase of 285% over the $.2 million recorded

for the first quarter of fiscal 1999, and net losses had decreased significantly from $5.8

million in the first quarter of fiscal 1999 to $1.9 million in the first quarter of fiscal 2000:

> Sonic Innovations Inc. (NASDAQ: SNCI), marketer of NATURA and CONFORMA advanced digital hearing aids, Thursday announced record results for its first quarter ended March 31, 2000.
>
> Net sales for the quarter totaled $12,396,000, a 285 percent increase from net sales of $3,221,000 for last year's first quarter and an 8 percent ($935,000) increase from the prior quarter. The company has now posted six

consecutive quarters of record net sales since its initial sales were made in the third quarter 1998.

Net loss applicable to common stockholders for the quarter was $1,999,000 ($1.32 per common share) compared to $5,792,000 ($4.42 per common share) for last year's first quarter.

\* \* \*

Andy Raguskus, president and chief executive officer, stated, "We are very pleased with our financial results for our first quarterly earnings release as a publicly held company. Our financial progress is a result of the success of our products in the market as demonstrated by our increased revenue base.

"We are quite pleased with the growth in our branded hearing aid sales *and the continued strength of our hearing aid component business.*"

64.    On May 30, 2000, US Bancorp issued a series of three reports on Sonic, authored by Scott R. Davidson ("Davidson"), which were based on and repeated statements made by defendants Raguskus and Wilson in meetings between Davidson, Raguskus and Wilson immediately before, or shortly after, the IPO. During their meetings, despite their knowledge of the disastrous state of the Starkey relationship, defendants Raguskus and Wilson stated that Sonic had generated strong revenue growth by selling its hearing aid components to Starkey, that its relationship with Starkey was strong and that Starkey was committed to purchase a minimum quantity of components through 2001, which would generate up to $35 million in sales for Sonic. Davidson's report, which is known as a "booster shot," was issued in connection with Sonic's IPO and was intended to help support Sonic's stock price. Davidson initiated coverage on Sonic, recommended the stock with a "Buy" rating, forecasted increasing revenues and earnings through fiscal year 2001, and estimated that Sonic's stock price would reach $25 per share within 12 months:

| Price: $19 1/4 | | 52-Week Range | $17 - $25 |
| FY End: December | | 12-Month Price Target | $25 |

| FY EPS | 1999 | 2000E | 2001E |
|--------|------|-------|-------|
| Mar | ($0.37) | ($0.06)A | |
| Jun | ($0.37) | ($0.06)E | |
| Sep | ($0.19) | $0.03 E | |
| Dec | ($0.13) | $0.06 E | |

| FY | ($1.05) | $0.04 E | $0.44 |
| P/E | (18.4) | 546.2 | 44.2 |

| Rev ($Mil) | 1999 | 2000E | 2001E |
|---|---|---|---|
| Mar | $3.2 | $12.4A | $17.8 |
| Jun | $5.6 | $13.1E | $19.6 |
| Sep | $8.4 | $15.0E | $21.1 |
| Dec | $11.5 | $17.0E | $23.0 |
| FY | $28.7 | $57.5E | $81.4 |

\*    \*    \*

Sonic is a fast-growing participant in the $2 billion global hearing aid industry. Leveraging a sophisticated new understanding of human hearing, Sonic has developed one of the industry's smallest and most advanced digital signal processing (DSP) chips. To date, Sonic has generated strong revenue growth principally through the sale of its DSP chip to OEM partners.

65.    Also on May 30, 2000, Deutsche Banc issued its own "booster shot" in two reports on Sonic, authored by Bruce N. Jacobs ("Jacobs"), which were based on and repeated statements made by defendants Raguskus and Wilson in meetings between Jacobs, Raguskus and Wilson immediately before, or shortly after, the IPO. During their meetings, despite their knowledge of Sonic's problems with Starkey, defendants Raguskus and Wilson told Jacobs that its relationship with Starkey was highly profitable and that Starkey had contracted to purchase $35 million in components through 2001 with minimum annual commitments. Defendants Raguskus and Wilson also represented that Sonic's relationship with Starkey was "healthy," but warned that *if* Sonic were to lose any of its OEM business (26% of which came from Starkey in 1999), the loss of revenue *could have* a meaningful impact on Sonic's growth. Jacobs' reports were issued in connection with Sonic's IPO and were intended to help support Sonic's stock price. Jacobs initiated coverage on Sonic, recommended the stock with a "Buy" rating, forecasted increasing earnings through fiscal year 2001 and estimated Sonic's stock price would reach $25 per share by year end:

| Date: | 05/30/2000 | EPS | 1999A | 2000E | 2001E |
|---|---|---|---|---|---|
| Price: | 19.25 | 1Q | (0.37) | (0.13)A | 0.09 |
| 52-Wk Range: | 25-17 | 2Q | (0.37) | (0.08) | 0.10 |

- 29 -

\*   \*   \*

HIGHLIGHTS:
We are initiating research coverage of SONIC innovations with a BUY investment rating and a $25 year-end price target.

\*   \*   \*

SONIC is an industry pioneer in digital hearing aid technology and has developed the most technologically advanced products on the market, which has been validated by several important OEM agreements.

\*   \*   \*

Finally, we believe that the value of SONIC's technology has been validated by an extensive licensing business, through which other hearing aid companies have agreed to incorporate SONIC's DSP platform into their own devices sold under their own brand name. *The most notable and important licensing agreement is with Starkey, the industry's leader in terms of market share. Starkey has contracted to purchase almost $35 million of chips over the 2000-2001 time period with minimum annual commitments.* We believe that the licensing business should have a positive impact on the company's overall financial performance, for at least two reasons. First, SONIC's licensing agreements include minimum numbers of units, which add predictability to the business and leave the potential for upside. Second, the segment of the business is highly profitable, which should help expand the company's gross margin.

\*   \*   \*

OEM Business

*[We] expect SONIC's OEM relationships to remain healthy.* First, firms such as Starkey have invested in SONIC's technology and thus have a vested interest in continuing the relationship. Second, many of SONIC's partners have tried for years to develop a digital product, but have failed and thus turned to SONIC. Finally, SONIC will continue to innovate, we believe compelling its partners to continue to renew their contracts if they want to keep pace with the cutting edge products SONIC is developing.

66.    The statements made by defendant Raguskus on RadioWallStreet.com, and in Sonic's May 11, 2000 press release, and by both Raguskus and Wilson to analysts Davidson and Jacobs describing the strength of Sonic's relationship with Starkey, the existence of Starkey's annual commitments and the success that selling "one generation old technology" to Starkey brought to Sonic were false or misleading when made. Contrary to these representations, Sonic's relationship with Starkey was not "strong" or "profitable" but had

- 30 -

started to deteriorate before the IPO because Raguskus concealed the development of Sonic's IC-2 chip from Austin during their original negotiations in late 1998 and early 1999. Shortly after discovering the IC-2 chip's technology in April 2000, Austin told defendant Raguskus that Starkey would cancel the OEM Agreement if Sonic did not give Starkey access to Sonic's IC-2 chip, refused to pay for many of the IC-1 chips that Sonic had already delivered to Starkey, and defaulted on at least $1.6 million in payment obligations to Sonic. Thus, contrary to defendants' representations, *Sonic's "strategy" of selling one generation old technology to Starkey had not "worked well" for Sonic, had caused Sonic's relationship with Starkey to deteriorate and eliminated the chance that Sonic would receive $35 million in sales to Starkey through 2001.*

67.     Defendants' statements about the risks to Sonic if it were to lose Starkey as a partner were also false or misleading. In addition to Starkey's stated intent to cancel the OEM Agreement if Sonic did not give Starkey access to the IC-2 chip, Sonic also lost revenue from its problems with Starkey as it had accepted returns of up to 1,700 IC-1 chips from Starkey that had previously been incorporated into Starkey's hearing aids because of noise problems associated with those chips. The circuit noise complained of by Starkey's customers was caused directly by a circuitry component in the IC-1 chip that could not be corrected. These returns were in direct contravention of Sonic's publicly announced policy of not accepting returns on component shipments, and caused Sonic to improperly recognize revenue from the sale of IC-1 chips to Starkey. Thus, what defendants characterized as a "risk" to Sonic was actually happening – Sonic was losing its primary OEM partner, which was having a meaningful impact on Sonic's revenue and growth outlook. Sonic failed to disclose these highly material facts to the investment community.

68.     On July 25, 2000, despite its problems with Starkey, and Starkey's default on millions of dollars in payment obligations to Sonic, Sonic announced purported "Record Quarterly Net Sales and Earnings" for its second quarter ended June 30, 2000, results which

defendant Raguskus represented were based on "'strong performance in both the branded product and hearing aid component segments'" of Sonic's business. According to the release, net sales for the quarter were a record $13.1 million, an increase of 133% over the $5.6 million recorded for the second quarter of fiscal 1999, and net losses had decreased dramatically from $5.2 million in the second quarter of fiscal 1999 to $582,000 in the second quarter of fiscal 2000. Sonic also announced that branded product sales were $7.8 million in the second quarter of 2000, a 74 percent increase from branded product sales in the second quarter of fiscal 1999, and that hearing aid component sales jumped to $5.2 million from $1.1 million in the second quarter of 1999:

> Sonic Innovations Inc. (Nasdaq: SNCI), marketer of NATURA(TM) and CONFORMA(TM) advanced digital hearing aids, Tuesday announced record revenues for its second quarter ended June 30, 2000.
>
> Net sales for the quarter totaled $13,121,000, a 133 percent increase from net sales of $5,642,000 for last year's second quarter and a $725,000, or 6 percent, increase from the quarter ended March 31, 2000. The company has now posted seven consecutive quarters of record net sales since its initial sales were made in the third quarter 1998.
>
> Net loss for the second quarter on a pro forma basis was $582,000 ($.03 per share) compared to pro forma net loss of $5,220,000 ($.38 per share) for last year's second quarter. Excluding non-cash charges for stock-based compensation and imputed interest, the second quarter 2000 would have reflected pro forma net income of $124,000 ($.01 per share).
>
> Branded product sales, comprised of the company's NATURA and CONFORMA product lines, were $7,889,000 in the second quarter 2000, a 74 percent increase from branded product sales of $4,529,000 recorded in last year's second quarter and a 9%, or $644,000, increase from the first quarter 2000 level. Hearing aid component sales were $5,232,000 in the second quarter 2000 compared to $1,113,000 in the second quarter 1999 and $5,151,000 in the first quarter 2000.
>
> Andy Raguskus, president and chief executive officer, stated, *"We are pleased to report the achievement of record net sales and earnings, led by strong performance in both the branded product and hearing aid component segments of our business* during a very busy second quarter.
>
>                \*    \*    \*
>
> Gross profit of $6,577,000 for the second quarter also established a quarterly record and was up 212 percent from the $2,110,000 recorded in last

- 32 -

year's second quarter. Gross margin for the quarter improved to 50.1 percent from 37.4 percent in the comparable quarter in 1999.

> ***The improvement was primarily due to the significant increase in higher margin hearing aid component sales,*** fixed costs of the company's manufacturing operations being spread over a greater sales volume and gains in operating efficiency derived from manufacturing at higher quantities.

*  *  *

> For the six months ended June 30, 2000, net sales of $25,517,000 increased 188 percent from $8,863,000 recorded for the corresponding period in the prior year. Net loss on a pro forma basis of $1,519,000 ($.09 per share) improved from pro forma net loss of $10,437,000 ($.75 per share).

69.     On or about July 25, 2000, following the release of these results, defendants Raguskus and Wilson held a conference call with analysts, large Sonic stockholders, investment managers and institutional investors. During the call, defendants Raguskus and Wilson made the following false and misleading statements:

- Sonic forecasted third quarter sales of $15.5 million and 18% sequential growth;

- Starkey had purchased $8 million in components from Sonic in 2000;

- Starkey was on track to reach its annual minimum requirement for 2000 of $16 million and that Starkey's minimum commitment for 2001 totaled $18 million;

- Sonic's relationship with Starkey was "strong," "solid" and "highly profitable;"

- Both Sonic and Starkey would benefit from a contract extension beyond 2001;

- Sonic and Starkey were renegotiating the OEM agreement to give Sonic guaranteed minimum quarterly orders and that Sonic was considering giving Starkey earlier access to its new technology;

- An increase in accounts receivable from $5.6 million in the first quarter to $10.6 million in the second quarter was not a concern because Sonic had merely extended its 30-day payment cycle to be more in line with the industry norm of 90-120 days;

- Sonic's 30-day payment-cycle existed prior to the IPO only because of Sonic's cash constrained position and that Sonic had decided to extend the terms to Starkey after receiving $54 million in cash from the IPO.

70.     Following the call, Deutsche Banc, US Bancorp and Goldman Sachs issued reports on Sonic that were based on and repeated Raguskus and Wilson's representations:

- 33 -

(a)     On July 26, 2000, Deutsche Banc issued the following a report on Sonic, written by Jacobs, entitled:  "Sonic Innovations, Inc. (SNCI) 'BUY' 2Q00 Results In-Line With Expectations":

| EPS: | 1999A | 2000E |
|------|-------|-------|
| 1Q | (0.37) | (0.13) |
| 2Q | (0.37) | (0.03)A |
| 3Q | (0.19) | 0.03 |
| 4Q | (0.13) | 0.08 |
| FY(Dec.) | (1.06) | (0.01) |

*   *   *

-- Hearing aid component sales through the company's OEM partnerships totaled $5.2 million, up a modest 2% from 1Q00 but over 350% from the same period last year. Starkey, the company's largest OEM partner, has purchased roughly $8 million in components so far this year, and appears on track to reach its minimum annual requirement for 2000 of $16 million.

-- *Note that the Starkey agreement calls for a minimum of $18 million of sales next year, and management reports that the relationship remains solid and that both companies stand to benefit from a contract extension beyond 2001.* However, the existing contracts have annual minimums, and are thus potentially subject to quarterly fluctuations. SONIC hopes to alter the contract by establishing quarterly minimums, potentially in exchange for earlier access to the company's innovative technologies.

(b)     On July 26, 2000, US Bancorp issued the following report on Sonic, written by Davidson, entitled: "Very Solid 2Q Performance, Reiterating Buy Rating; $25 Target":

| FY EPS | 2000E | Rev ($Mil) | 2000E |
|--------|-------|------------|-------|
| Mar | ($0.06)A | Mar | $12.4 A |
| Jun | ($0.03)A | Jun | $13.1 A |
| Sep | $ 0.03E | Sep | $15.0 E |
| Dec | $ 0.06E | Dec | $17.0 E |
| FY | $ 0.04E | FY | $57.5 E |

*   *   *

-- Yesterday's Conference Call Reinforced Our Confidence In Sonic's Prospects For The 3rd And 4th Quarters. We point to several factors that should support an accelerating revenue picture during the back half of the year, including: 1) broad-based availability of NATURA 2 and CONFORMA 2, which both contain Sonic's excellent second-generation "IC-2" chip; 2) continued development of alternative sales channels, including expanding relationships with hearing aid consolidator Sonus and WalMart/National Hearing Centers; 3) the potential for an improved behind-the-ear aid to help

accelerate sales in Europe, and; 4) an improving margin structure which should help Sonic to achieve profitability beginning in the third quarter.

\* \* \*

SEVERAL IMPORTANT FACTORS SHOULD HELP TO DRIVE Q3 SALES AND EARNINGS

*We left yesterday's conference call significantly encouraged as to Sonic's outlook for the third and fourth quarters.* In our opinion, the company achieved a very solid second quarter performance despite several challenges which will not be relevant in future quarters. Additionally, several key new products and important new distribution channels came on-line late in the second quarter and should have a much greater impact in the third quarter. With new revenue engines kicking in and a variety of challenges fading into the past, we believe Sonic's near-term outlook looks bright.

(c)     On August 1, 2000, Goldman issued the following report on Sonic, written by Keusch, entitled "New products drive solid second-quarter growth....":

**Starkey relationship remains productive, but could be revised**

*Starkey continues to be a key relationship for Sonic Innovation with an annual sales commitment of $16 million in 2000 and $18 million in 2001. Although the relationship with Starkey remains solid*, we anticipate that the agreement will be revised to give Sonic Innovations a quarterly sales commitment in exchange for earlier access to new technology. Once a deal is hammered out, we believe that it will be a positive for Sonic Innovations's shares.

\* \* \*

**Component sales to OEM partners may fluctuate.** Component sales to established hearing-aid manufacturers have accounted for a significant proportion of the company's revenues to date. While sales to OEM partner, Starkey, are guaranteed on an annual basis in 2000 and 2001, quarterly sales could fluctuate. *We continue to believe that a revised agreement will include minimum quarterly sales in exchange for Starkey gaining earlier access to new technology.*

\* \* \*

- Accounts receivable for the quarter nearly doubled to $10.6 million from $5.6 million in the first quarter. *After speaking to management, we do not believe the increase to be of substantial concern upon consideration of the events in the quarter*.

\* \* \*

- 35 -

### A near-term Starkey overhang

*Sonic's relationship with Starkey, its largest customer, continues to be productive and highly profitable. Starkey remains contractually committed to $16 million in DSP chip purchases in 2000 and $18 million in 2001.*

The Starkey relationship remains an important source of high-margin revenues for Sonic Innovations. However, the lack of a quarterly sales minimum has been an issue for investors. Although Starkey is committed to annual sales, we believe that near-term visibility issues have been weighing on the shares.

## Developments in the quarter

*There are two items to note regarding the relationship with Starkey. First, Sonic loosened its payment terms towards industry averages from tight pre-IPO terms. Second, we expect the two parties to revise their agreement, which will give Sonic quarterly sales minimums and modestly accelerate the access to new technology for Starkey.*

### Expect revised contract to be hammered out shortly

*With Sonic Innovations now a public company, it is not surprising that management would like to have a quarterly sales minimum from Starkey. In turn, Starkey would like to accelerate its access to new technology. Based on our conversation with management, we believe that the parties will fine-tune the agreement in the near term. We suspect that Sonic will probably make newer technology available to Starkey – but not the newest – in exchange for more stable quarterly minimums.*

From a competitive perspective, we do not see any significant issues with Starkey having access to newer technology for the following reasons: First, sales of chips to Starkey are highly profitable for Sonic. Second, the continued customer satisfaction with DSP chips enhances the company's reputation in the industry. And lastly, there is still plenty of room for share gains at Sonic with the company annualizing at only 3% market share in 2000. This presents Sonic with a significant opportunity for market share gains.

\* \* \*

## No concern regarding rise in account receivable

Account receivable for the quarter nearly doubled to $10.6 million from $5.6 million in the first quarter. *After speaking to management, we do not believe the increase to be of substantial concern upon consideration of the events in the quarter. In particular, Sonic extended its payment terms to its largest OEM customer, Starkey Labs. As a result of Sonic's cash-constrained position prior to its IPO in May, Starkey was on a 30-day payment cycle.* Although the terms were necessary for Sonic to meet its payroll and payable obligations, the 30-day cycle was significantly tighter than the industry norm of 90-120 days. We believe that [Starkey] agreed to these

strict terms as a result of its strong desire to gain access to Sonic's DSP technology. However, in light of $54 million in cash following the IPO and the company nearing profitability, Sonic extended more normalized terms to Starkey in the quarter. Following the initial leap in the second quarter, we do not anticipate accounts receivable to rise appreciably higher in the quarters to come.

71.    Sonic's press release announcing "record" results for the second quarter of 2000 was materially false and misleading when made. Contrary to the release, Sonic's purported "record" results for the second quarter of 2000 were materially overstated because Sonic had shipped excessive quantities of its IC-1 chips to Starkey knowing that Starkey wanted Sonic's IC-2 chip and that the IC-1 shipments would be returned. In fact, Starkey refused to pay for the IC-1 chips previously shipped by Sonic and had returned at least 1,700 IC-1 chips to Sonic in the second quarter, which was in direct contravention of Sonic's publicly announced policy of refusing component returns from hearing aid manufacturers. Sonic improperly recognized revenue on its shipments of IC-1 chips to Starkey in violation of SFAS 48 and FASB 5, which prohibit the recognition of revenue when a right of return exists or when receivables cannot be collected. Starkey's refusal to pay for previous shipments, and its return of Sonic's IC-1 chips in the face of Sonic's publicly stated "no return" policy, directly implicated these accounting principles, rendered Sonic's recognition of revenue improper and made Sonic's report of "record" revenues and earnings false and misleading.

72.    The statements made by defendants during Sonic's July 25, 2000 conference call describing Sonic's relationship with Starkey as "strong, " "solid" and "highly profitable," and guaranteeing revenues for Sonic through 2001 were also false and misleading when made. Contrary to these representations, Sonic relationship with Starkey was not "strong" or "profitable" but had been deteriorating since before the IPO because Raguskus concealed the development of Sonic's IC-2 chip from Austin during their original negotiations in late 1998 and early 1999. Shortly after discovering the IC-2 chip's technology in April 2000, Austin told defendant Raguskus that Starkey would cancel the OEM Agreement if Sonic did not give Starkey access to Sonic's IC-2 chip, refused to pay for many of the IC-1 chips that

Sonic had already delivered to Starkey and defaulted on at least $6.6 million in payment obligations to Sonic.  In fact, by the end of the second quarter, Sonic's DSO's for sales to Starkey had skyrocketed from 49 days in the first quarter to an *127 days* in the second quarter.  As a result, by July 25, 2000, Starkey had not "purchased" $8 million in components from Sonic in 2000, was *not* on track to reach its annual minimum requirement for 2000 of $16 million and did *not* guarantee annual orders for Sonic of $16 million in 2000 and $18 million in 2001.  In fact, Sonic's relationship with Starkey was in such a state of disarray that defendants knew that it was impossible to achieve its forecasted results of $15.5 million in revenue and 18% sequential growth in the third quarter of 2000 or its forecasted results through FY2001.

73.    Defendants' representations characterizing Sonic's contract renegotiations with Starkey, and explaining the $5 million jump in accounts receivable, were also materially false or misleading.  Defendants' suggestion that the parties were negotiating to provide Sonic quarterly minimums because of its status as a publicly traded company was merely a smoke screen to the reality of the negotiations – Sonic was negotiating with Starkey solely because of Austin's threat to cancel the entire agreement if Sonic did not sell Starkey its IC-2 chip.  Also contrary to defendants' explanation that Sonic's accounts receivable had increased because of Sonic's desire to extend Starkey's payment terms to the industry norm of 90 to 120 days, Sonic offered payment terms to Starkey that *exceeded the industry norm* in a desperate attempt to get Starkey to place orders for the IC-1 chip in the third and fourth quarters of 2000, and to provide an explanation for Starkey's default on its payment obligations.  Indeed, without this extension (which was 180 days, and not the 90-120 days as represented), Starkey would have defaulted on $6.6 million in payment obligations by the second quarter of 2000.  In any event, the extension was illusory because Starkey refused to pay for Sonic's IC-1 shipments regardless of when payment was due.  Thus, defendants blatantly misrepresented

the status of Sonic's relationship with Starkey and the true explanation for the reported contract negotiations.

74.    On August 25, 2000, Goldman Sachs issued another report written by Keusch. The report was entitled "Weakness in Sonic Innovations shares results in superb buying opportunity," and repeated statements made by Wilson and Raguskus in a meeting with Keusch on August 24, 2000.  During the meeting, defendants Raguskus and Wilson told analyst Keusch that Sonic was on track to meet forecasted results of $15.5 million in revenue and sequential growth of 18% in the third quarter of fiscal 2000 and that Sonic's contract renegotiations with Starkey were not a concern because the relationship continued to be productive and highly profitable.  Defendants Raguskus and Wilson also represented that Starkey continued to be committed to annual sales, and that Sonic and Starkey were revising their agreement to give Sonic quarterly sales minimums in exchange for modestly accelerating Starkey's access to newer technology (but not the newest).   Wilson and Raguskus made these statements knowing that they would be repeated to investors in order to artificially inflate the value of Sonic's stock price.  The report stated:

> We *continue to recommend purchase* of Sonic Innovations with a $25 price target.  Yesterday, Sonic shares fell under considerable pressure with the stock now trading below $14.  *Following a discussion with management, we remain comfortable that the company remains on track to meet our $15.5 million third quarter sales estimate, which represents 18% growth on a sequential basis*.  With it's large market opportunity and solid sales velocity, especially with its recently launched Natura II product line, we continue to believe that valuation is compelling for Sonic.  With our $25 price target implying 88% upside from current levels, we view the recent weakness in the stock as a significant buying opportunity.

*   *   *

> SHARES UNDER PRESSURE.  Sonic Innovations' shares have been under considerable pressure recently, with the shares trading down yesterday $2 5/8 to $13 5/16 on fairly heavy trading.  *We suspect that some of the recent weakness may be related to (1) concerns over the company's ability to meet third quarter expectations, and in a somewhat related matter, (2) uncertainly* [sic] *surrounding the OEM contract renegotiations with Starkey.  Following a discussion with management last night, at this point we have no reason to believe that third quarter revenues or earnings will come in materially different from our own expectations, nor do we believe that the ongoing talks*

- 39 -

*with Starkey should be a source of concern.* In fact, we note that there is no change to our expectation that the company will reach profitability in the third quarter of this year. With no change in our fundamental outlook for the company, we consider yesterday's 16.5% drop in the shares to be a significant buying opportunity for investors.

*    *    *

*SONIC CONTINUING ITS CONTRACT NEGOTIATIONS WITH STARKEY, RELATIONSHIP REMAINS STRONG. Sonic's relationship with Starkey, its largest customer, continues to be productive and highly profitable. Starkey remains contractually committed to $16 million in DSP chip purchases in 2000 and $18MM in 2001.* However, with Sonic Innovations now a public company, it is not surprising that management would like to have a quarterly sales minimum from Starkey. In turn, Starkey would like to accelerate its access to new technology. The two parties are currently in negotiations to revise their agreement, which will give Sonic the stability of quarterly sales minimums and modestly accelerate the access to new technology for Starkey. We expect a revised deal to be hammered out in the near term.

From a competitive prospective [sic], *we do not see any significant issues with Starkey having access to new technology. First, sales of chips to Starkey are highly profitable for Sonic. Second, the continued customer satisfaction with Sonic DSP chips enhances the company's reputation in the industry. And lastly, there is still plenty of room for share gain at Sonic with the company annualizing at only 3% market share in 2000.* This in of itself presents Sonic with a significant opportunity for market share gains.

75.    On September 11, 2000, Sonic issued a press release entitled: "Sonic Innovations Inc. Receives $8 Million in Purchase Orders; Largest Customer Places Third and Fourth Quarter Orders," and announced that Starkey had placed orders of $4 million in each of the third and fourth quarters. According to defendant Raguskus, the $8 million order caused Starkey to "meet its annual commitment *under [their] existing agreement*" for 2001 and had "resolve[d] the quarter-to-quarter order uncertainty" for Sonic for the year:

Sonic Innovations Inc. (Nasdaq: SNCI) Monday announced that it has received purchase orders from its largest customer, Starkey Laboratories Inc., for $4 million of hearing aid components for delivery in the third quarter ending Sept. 30, 2000 and $4 million of hearing aid components for delivery in the fourth quarter ending Dec. 31, 2000.

Andy Raguskus, president and chief executive officer, commented, *"We are very pleased that Starkey has ordered hearing aid components for each of the third and fourth quarters. With these orders, Starkey will not only meet its annual commitment under our existing agreement, but will also*

- 40 -

*resolve the quarter-to-quarter order uncertainty for Starkey purchases from us in 2000."*

76.     The analyst report issued by Goldman Sachs on August 25, 2000, the statements made by defendants Raguskus and Wilson during Sonic's meeting with Goldman Sachs the previous day describing Sonic's relationship with Starkey as "productive" and "highly profitable" and defendants' forecasts for Sonic's growth were false and misleading when made.  Contrary to these representations, Sonic's relationship with Starkey was not "strong" or "profitable" but had been deteriorating since before the IPO.  Shortly after discovering the IC-2 chip's technology in April 2000, Austin told defendant Raguskus that Starkey would cancel the OEM Agreement if Sonic did not give Starkey access to Sonic's IC-2 chip, refused to pay for many of the IC-1 chips that Sonic had already delivered to Starkey and had defaulted on at least $6.6 million in payment obligations to Sonic by the end of Sonic's second quarter.  As a result, by August 25, 2000, Starkey was *not* on track to reach its annual minimum requirement for 2000 of $16 million as represented.  In fact, Sonic's relationship with Starkey was in such a state of disarray that defendants knew that it was impossible to achieve its forecasted results of $15.5 million in revenue and 18% sequential growth in the third quarter of 2000 or its forecasted results through FY2001.

77.     Defendants' representations allaying the market's concern about Sonic's ongoing discussions with Starkey were also materially false and misleading.  Defendants' suggestion that the parties were negotiating to provide Sonic quarterly minimums because of its status as a publicly traded company was merely a smoke screen to the reality of the negotiations – Sonic was negotiating with Starkey solely because of Austin's threat to cancel the entire agreement if Sonic did not sell Starkey its IC-2 chip.  In fact, Sonic's offer to extend payment terms that *exceeded the industry norm* was a desperate attempt to get Starkey to place orders of the IC-1 chip in the third and fourth quarters of 2000 and to provide an explanation for Starkey's refusal to pay for Sonic's IC-1 chips.  Without this 180-day extension, Starkey would have defaulted on $6.6 million in payment obligations by the

second quarter of 2000. In any event, the extension was illusory because Starkey refused to pay for Sonic's IC-1 shipments regardless of when payment was due. Thus, defendants Raguskus and Wilson blatantly misrepresented the status of Sonic's relationship with Starkey and the true explanation for the reported contract negotiations.

78.     Sonic's announcement that Starkey had agreed to place a total of $8 million in orders for 2001 was also materially false or misleading. Contrary to defendants' representations that Starkey would "meet its annual commitment *under our existing agreement*," *the entire OEM Agreement had been renegotiated for Sonic to obtain the order*. Under the terms of the original agreement, Starkey was obligated to purchase a minimum quantity of Sonic "hybrids" *as they existed on April 1, 1999* (*i.e.*, the IC-1 chip). However, the orders that Sonic announced on September 11, 2000 were only agreed to by Starkey after defendant *Raguskus agreed to ship IC-2 chips to Starkey in the fourth quarter of 2000* (which defendants had told analysts that Sonic would not do), and agreed to a return of between $2 million and $5 million worth of product that it had previously shipped to Starkey. In fact, Sonic later admitted in its Form 10-Q for the third of quarter 2000 (filed after the Class Period) that it had accepted returns from Starkey of $400,000 in the third quarter "to allow for a potential exchange of certain first generation components for *second generation components by our largest customer*." In addition to these admitted returns, Sonic also agreed to accept a return of at least 13,000 IC-1 chips in the fourth quarter of 2000 in order to secure the announced $8 million in orders, and had accepted regular returns totaling approximately 5,100 chips (or approximately $1 million) to maintain its relationship with Starkey. At no time during the Class Period did defendants disclose this highly material information to investors.

79.     On October 24, 2000, defendants shocked the investment community by disclosing what defendants had known since the start of the Class Period – that Sonic did not expect to receive predictable quarterly orders from Starkey in 2001, that its relationship with

Starkey had become a "challenge" and that the Company had reduced its expectation for a long-term relationship with Starkey. In an attempt to counter the negative reaction that was imminent from this dramatic announcement, Sonic revealed the information in connection with an extremely positive press release announcing "record" net sales and earnings for the third quarter of fiscal 2000, which was represented as the first quarter that Sonic had ever achieved profitability.

80.   While defendants' press release announced problems with the Starkey relationship, defendants Raguskus and Wilson's statements during Sonic's conference call the same day described a much more dismal scenario, which one analyst stated "[realized his] worst fears." During the conference call, defendants Raguskus and Wilson confirmed that Sonic's relationship had become a challenge, but stated that Sonic was removing Starkey revenue from its 2001 forecast altogether despite the existence of the OEM Agreement requiring Starkey to place $18 million in orders during the year. In response to this horrid news, analysts dramatically reduced their earnings estimates for fiscal 2001 by up to 90%, with Goldman reducing its estimate from 48 cents to 5 cents per share, Deutsche Banc reducing its estimate from 45 cents to 8 cents and US Bancorp reducing its estimates from 44 cents to 4 cents.

81.   That same day, *Bloomberg News* provided insight on the true status of Sonic's relationship with Starkey, which *defendant Raguskus publicly admitted had been a problem since the IPO*. In fact, on October 24, 2000, defendant Raguskus told *Bloomberg* reporter David Evans that "the two companies *ha[d] been negotiating the future of their relationship for the past five months*." *Bloomberg* also interviewed Starkey CEO, William Austin, about the problems with the relationship, who stated that Starkey could not sell Sonic's products because of noise defects and that Starkey refused to accept any further shipments from Sonic:

> Sonic Innovations Inc.'s largest customer said it *has halted purchases* from the Salt Lake City-based maker of digital hearing aids, citing quality problems with its products. The customer, Starkey Laboratories Inc., said Sonic has been *unable to correct defects* in hearing aids shipped for resale under

Starkey's brand names. *"We're not taking any more product*," said William Austin, chief executive and owner of Starkey, in a interview. *"We can't sell it."* He said Sonic's hearing aids have noise problems. A Sonic spokesman wasn't immediately available to comment on Starkey's allegations.

82.     As a result, Sonic's stock price fell to $5.50 on heavy trading volume and caused shareholders millions in damages. Later, Sonic reported horrible fourth quarter results, which were due to millions of dollars worth of product returns from Starkey. Sonic announced fourth quarter net sales of only $12.1 million and a large net loss of more than $1.3 million, with virtually no sales to Starkey. More importantly, Sonic and Starkey agreed to amend their agreement, *which eliminated Starkey's minimum purchase obligation for 2001*. According to defendant Raguskus:

> At this point everything is absolutely square [with Starkey]. I think we have – we had a tough time with Starkey and now I think we have a relationship that's been put back very much on an even footing where *they really get what they want, which is really at the end of the day, no guarantees of future purchases*, and we very much get what we wanted which is no guarantee that we have to sell them our most recent or current technology.

## SONIC'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

83.     In order to inflate the price of Sonic's stock, defendants caused the Company to falsely report its results for at least the 2Q00 through improper revenue recognition on shipments to Starkey and failing to adequately accrue for product returns, thereby materially overstating its revenue, net income and EPS in at least the 2ndQ00. Ultimately, Sonic reported a horrible 4thQ00, which was due to millions of dollars worth of product returns from Starkey.

84.     Sonic reported the following amounts for the 2ndQ and 3rdQ00:

|  | 6/30/00 | 9/30/00 |
| --- | --- | --- |
| Revenue | $13.1 M | $14.0 M |
| Net Income (Loss) | ($582,000) | $665,000 |
| E P S | ($0.03) | $ 0.03 |

85.     Sonic included its 2ndQ00 results in a Form 10-Q filed with the SEC. The Form 10-Q, which was signed by Wilson, represented that:

- 44 -

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information, and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by U.S. generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments (consisting only of normal recurring adjustments) considered necessary for a fair presentation have been included.

86.     These representations were false or misleading when made because Sonic's financial statements for the 2ndQ00 were not a fair presentation of Sonic's results, and were presented in violation of GAAP and SEC rules.

87.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Reg S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. §210.10-01(a)).

88.     Defendants caused Sonic to falsify its reported financial results through its improper revenue recognition on Sonic's shipments of hearing aid components to Starkey by tacitly granting to Starkey the right to return unsold product. Pursuant to GAAP, Sonic should have deferred recognition of revenue on such shipments, but did not in order to inflate its reported results. Moreover, pursuant to GAAP, Sonic was required to adequately accrue reserves for product returns, but did not in order to report growing earnings per share during the Class Period.

89.     GAAP, as set forth in FASB Statement of Accounting Standard ("SFAS") No. 48, Revenue Recognition When Right of Return Exists, prohibits the recognition of revenue when the right of return exists unless certain conditions are met. SFAS No. 48

applies to transactions "in which a product may be returned, whether as a matter of contract or as a matter of existing practice." SFAS No. 48, ¶3. SFAS No. 48, ¶¶6-7 state:

> 6. If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if <u>all</u> of the following conditions are met:
>
> > a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.
> >
> > b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.
> >
> > f. The amount of future returns can be reasonably estimated.

90.      GAAP, as set forth in FASB Statement of Concepts No. 5, describes the fundamental requirements for revenue to be recognized:  that it be earned and that it be realizable (or collectible). See Concepts No. 5, ¶¶83-84.

91.      Sonic violated GAAP in Q200 and Q300 by recording revenues upon shipping excessive quantities of its first generation hearing aid component to Starkey, even though it knew Starkey wanted newer technology.  Because of improved technology and excess quantities shipped, defendants knew Starkey would return large quantities of chips, but could not estimate total returns at the time.  The shipments to Starkey were the most important part of Sonic's reported sales during the Class Period, representing $4.1 million and $3.6 million in sales in the 2ndQ and 3rdQ, respectively.

92.      Unfortunately for investors, these results, and the representations concerning them, were false.  In the 2ndQ00, Starkey ceased paying for much of the product shipped and ultimately returned more than $2 million worth of product previously recognized as sales. This included a single shipment of some 13,000 units of returned components in the 4thQ00. It was subsequently disclosed that Starkey and Sonic had been renegotiating the contract since, at the latest, May 2000.  Absent the Company's improper accounting for revenues, Sonic would have reported no sequential revenue growth in the 2ndQ and, in fact, a sequential decrease.

93.    Contrary to Sonic's representations in IPO Registration Statement/Prospectus that it "does not allow returns of its component products," Sonic regularly accepted returns from Starkey of up to 1,700 units at a time and more than 5,100 units throughout the Class Period. Many of these had already been installed in hearing aids.

94.    Ultimately, Sonic announced 4thQ 00 sales of only $12.1 million and a large net loss of more than $1.3 million. Sonic reported virtually no sales to Starkey in the 4thQ00.

95.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶12);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

96.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## FIRST CLAIM FOR RELIEF
### (For Violation of §11 of the Securities Act)

97.    Plaintiffs repeat and reallege ¶¶1-96.

98.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants  and is based upon defendants' negligence or theories of strict liability.

99.    The Registration Statement and Prospectus for the May 2, 2000 IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to other facts necessary to make the statements made not misleading and failed to adequately disclose material facts, as is described above.

100.    Sonic is the issuer of the stock sold via the Registration Statement.  As issuer of the shares, Sonic is strictly liable to plaintiffs and the Class for the material statements and omissions herein.

101.    Defendant Wilson signed the Registration Statement filed with the SEC as of May 2, 2000. Wilson did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement were true, did not omit any material fact and were not misleading.

102.    Each of the defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public, which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Sonic stock was artificially inflated in the IPO, and plaintiffs and the Class suffered substantial damage in connection with their purchase of Sonic common stock.  By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

103.    At the time they purchased Sonic shares, plaintiffs and other members of the Class were without knowledge of the facts concerning the false or misleading statements or

omissions alleged herein.  Less than one year has elapsed from the time that plaintiffs discovered, or reasonably could have discovered, the facts upon which this complaint is based, to the time that plaintiffs filed their complaint.  Less than three years have elapsed from the time that the securities upon which this claim is brought have been offered to the public, to the time plaintiffs filed their Complaint.

## SECOND CLAIM FOR RELIEF
### (For Violation of §12(a)(2) Of The Securities Act)

104.   Plaintiffs repeat and reallege ¶¶1-96.

105.   This claim is brought by plaintiffs on behalf of themselves and the Class pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), and is based upon defendants' negligence or theories of strict liability.

106.   The defendants named in this claim were sellers, offerors and/or solicitors of sales of the shares offered and sold in connection with the IPO.

107.   The actions of solicitation taken by the defendants named in this claim included participation in the preparation and dissemination of the false and misleading Prospectus. The written and oral communications made in connection with the Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and failed to disclose material facts.

108.   Sonic offered for sale and sold the shares purchased by plaintiffs and the Class.

109.   Each defendant named in this claim solicited and/or was a substantial factor in the purchase by each member of the Class of Sonic common stock.  But for the participation by these defendants, including the solicitation by these defendants as set forth herein, the IPO could not and would not have been accomplished.  The defendants named herein participated in the acts detailed herein as follows:

(a)   They actively and jointly drafted, revised and approved the Prospectus and other written selling materials by which the IPO was made to the investing public.  These

written materials were "selling documents," calculated by these defendants to create interest in Sonic common stock and were widely distributed by defendants for that purpose;

(b)    These defendants finalized the Registration Statement and Prospectus and caused them to become effective. But for these defendants having drafted, filed and signed the Registration Statement and Prospectus, the IPO of Sonic common stock could not have been made; and

(c)    These defendants conceived and planned the IPO and together jointly orchestrated all activities necessary to effect the sale of these securities to the investing public, by issuing the securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

110.    The defendants were obligated to make a reasonable and diligent investigation of the written and oral statements made in the Prospectus to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

111.    Plaintiffs and the other members of the Class purchased or otherwise acquired Sonic shares pursuant to the defective Registration Statement and Prospectus. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

112.    Plaintiffs hereby tender to defendants those securities which plaintiffs and the other members of the Class continue to own, on behalf of all members of Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

113.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. As a direct and proximate result of these violations of §12(a)(2), plaintiffs and the other members of the Class sustained substantial damage in connection with the purchase of Sonic stock. On behalf of all

- 51 -

members of the Class who still hold their Sonic shares, plaintiffs seek recessionary damages. Accordingly, plaintiffs, on behalf of all members of the Class who continue to own such securities, seek to exercise their right to rescind and recover the consideration paid for their Sonic shares and hereby elect to rescind and tender all Sonic shares held by members of the Class to the defendants sued herein.

114.   Less than three years has elapsed from the time that the securities upon which this claim is brought were sold to the public to the time of the filing of this action.  Less than one year has elapsed from the time when plaintiffs discovered, or reasonably could have discovered, the facts upon which this claim is based to the time of the filing of this action.

### THIRD CLAIM FOR RELIEF
### (For Violations Of §15 Of The Securities Act)

115.   Plaintiffs repeat and reallege ¶¶1-96.

116.   This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against defendants.

117.   The defendants, by reason of their stock ownership, management positions and/or membership or representation on the Company's Board of Directors, were controlling persons of the Company and had the power and influence, and exercised their power and influence, to cause Sonic to engage in the violations of law complained of herein.  These defendants are therefore liable under §15 of the Securities Act.

### FOURTH CLAIM FOR RELIEF
### (For Violation of §10(b) of the 1934 Act and Rule 10b-5)

118.   Plaintiffs repeat and reallege ¶¶1-96.

119.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Sonic common stock during the Class Period.

121.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonic stock.  Plaintiffs and the Class would not have purchased Sonic stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

122.   As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sonic common stock during the Class Period.

### FIFTH CLAIM FOR RELIEF
### (For Violation of §20(a) of the 1934 Act)

123.   Plaintiffs repeat and reallege ¶¶1-96.

124.   Defendants acted as controlling persons of Sonic within the meaning of §20(a) of the 1934 Act.  By reason of their positions with Sonic and ownership of Sonic stock, the defendants had the power and authority to cause Sonic to engage in the wrongful conduct complained of herein.  Sonic controlled each of the defendants and all of its employees.  By reason of such conduct, the defendants and Sonic are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

125. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonic stock (the "Class") during the Class Period. Excluded from the Class are defendants.

126. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Sonic had more than 19.6 million shares of stock outstanding, owned by hundreds, if not thousands, of persons.

127. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members include:

    (a)    Whether the 1993 Act was violated by defendants;

    (b)    Whether the 1934 Act was violated by defendants;

    (c)    Whether defendants omitted and/or misrepresented material facts;

    (d)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (e)    Whether defendants knew that their statements were false and misleading;

    (f)    Whether the price of Sonic stock was artificially inflated; and

    (g)    The extent of damage sustained by Class members and the appropriate measure of damages.

128. Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

129.   Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

130.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.   Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.   Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.   Awarding plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 15, 2001

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
EDWARD P. DIETRICH
DOUGLAS R. BRITTON

DOUGLAS R. BRITTON

600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

ANDERSON & KARRENBERG
SCOTT A. CALL
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: 801/534-1700

Liaison Counsel

N:\CASES\SonicInn\KRJ81004.CPT

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.    That on March 15, 2001, declarant served the AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of March, 2001, at San Diego, California.

KATHLEEN R. JONES

SONIC INNOVATIONS
Service List - 03/15/01
Page    1


COUNSEL FOR PLAINTIFF(S)

* Scott A. Call
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT   84101
   801/534-1700
   801/364-7697 (fax)

Charles J. Piven
LAW OFFICES OF CHARLES J.
   PIVEN, P.A.
The World Trade Center
401 East Pratt Street, Suite 2525
Baltimore, MD   21202
   410/332-0030
   410/685-1300 (fax)

Andrew M. Schatz
SCHATZ & NOBEL
330 Main Street
Hartford, CT   06106
   860/493-6292
   860/493-6290 (fax)

Paul J. Geller
CAULEY, GELLER, BOWMAN &
   COATES, LLP
2255 Glades Road, Suite 421A
Boca Raton, FL   33431
   561/750-3000
   561/750-3364 (fax)

Evan Smith
BRODSKY & SMITH, LLC
11 Bala Avenue, Suite 39
Bala Cynwyd, PA   19004
   610/668-7987
   610/660-0450 (fax)


Jeffrey C. Block
Michael G. Lange
BERMAN, DEVALERIO & PEASE LLP
One Liberty Square
Boston, MA   02109
   617/542-8300
   617/542-1194 (fax)

Marc A. Topaz
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA   19004
   610/667-7706
   610/667-7056 (fax)

Donald J. Enright
Conor R. Crowley
FINKELSTEIN THOMPSON & LOUGHRAN
The Foundry Building, Suite 601
1055 Thomas Jefferson Street, N.W.
Washington, DC   20007
   202/337-8000
   202/337-8090 (fax)

Jody Anderman
LEBLANC, MAPLES & WADDELL, LLC
5353 Essen Lane, Suite 420
Baton Rouge, LA   70809
   225/768-7222
   225/768-7999 (fax)

Mark McNair
LAW OFFICES OF MARK MCNAIR
1819 Pennsylvania Avenue
Suite 1050
Washington, DC   20006
   202/872-4717
   202/847-4718 (fax)

William S. Lerach
Edward P. Dietrich
Douglas R. Britton
MILBERG WEISS BERSHAD HYNES &
   LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA   92101-5050
   619/231-1058
   619/231-7423 (fax)

Marvin L. Frank
RABIN & PECKEL, LLP
275 Madison Avenue
New York, NY   10016
   212/682-1818
   212/682-1892 (fax)

SONIC INNOVATIONS
Service List - 03/15/01
Page   2


COUNSEL FOR DEFENDANTS

Douglas Clark
* WILSON SONSINI GOODRICH &
    ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA  94304-1050
    650/493-9300
    650/565-5100 (fax)


* Denotes service via overnight mail